ORAL ARGUMENT NOT YET SCHEDULED

**No. 12-1327**
_____

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

BNSF Railway Company,

*Petitioner*,

v.

Surface Transportation Board and
United States of America,

*Respondents*.
_____

On Petition for Review of a Final Order of the
Surface Transportation Board
_____

**BRIEF OF PETITIONER
(CORRECTED)**
_____

| | |
|---|---|
| Richard E. Weicher | Richard P. Bress |
| Jill K. Mulligan | Michael J. Gergen |
| BNSF RAILWAY COMPANY | Lori Alvino McGill |
| 2500 Lou Menk Drive | Paul T. Crane |
| Fort Worth, TX 76131 | LATHAM & WATKINS LLP |
| | 555 Eleventh Street, NW |
| Samuel M. Sipe, Jr. | Suite 1000 |
| Anthony J. LaRocca | Washington, DC 20004 |
| STEPTOE & JOHNSON LLP | Tel: (202) 637-2200 |
| 1330 Connecticut Avenue, NW | Fax: (202) 637-2201 |
| Washington, DC 20036 | |

*Counsel for Petitioner*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

The following information is provided pursuant to D.C. Circuit Rule 28(a)(1).

### (A)   Parties and Amici

*Petitioner.*      The Petitioner is BNSF Railway Company.

*Respondents.*   The Respondents are the Surface Transportation Board and the United States of America.

*Intervenors.*    Western Fuels Association, Inc. and Basin Electric Power Cooperative, Inc., have intervened.

*Amici.*         There are no amici.

### (B)   Rulings Under Review

The ruling under review is a decision of the Surface Transportation Board ("Board") served on June 15, 2012, in STB Docket No. 42088, *Western Fuels Association, Inc. & Basin Electric Power Cooperative v. BNSF Railway Company*.

### (C)   Related Cases

This case was previously before this Court in *BNSF Railway Company v. STB*, 604 F.3d 602 (D.C. Cir. 2010) (Nos. 09-1092, 09-1190, 09-1234), *cert. denied*, 131 S. Ct. 2441 (2011).

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, BNSF Railway Company ("BNSF") hereby states:

BNSF, a common carrier by railroad, is a wholly-owned subsidiary of its parent, Burlington Northern Santa Fe, LLC ("BNSF LLC"). BNSF LLC is an indirect, wholly-owned subsidiary of Berkshire Hathaway Inc., a publicly-held corporation.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

RULE 26.1 DISCLOSURE STATEMENT.............................................. ii

TABLE OF CONTENTS....................................................................... iii

TABLE OF AUTHORITIES ..................................................................v

GLOSSARY...................................................................................... vii

STATUTES, REGULATIONS, AND RULEMAKINGS.........................1

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUE.............................................................2

STATEMENT OF THE CASE..............................................................2

STATEMENT OF FACTS ....................................................................7

I.      REGULATORY BACKGROUND .............................................7

        A.      The Stand-Alone-Cost Test .............................................7

        B.      Cross-Over Traffic .........................................................8

        C.      In 2006, The Board Adopted The Average Total Cost ("ATC")
                Methodology For Allocating Cross-Over Traffic Revenues..............11

II.     PROCEDURAL HISTORY ......................................................16

        A.      WFA Filed A Rate-Reasonableness Complaint...................................16

        B.      The Board Held This Case In Abeyance Pending *Major Issues*.........17

        C.      The Board Concluded That WFA Failed To Prove That BNSF's
                Rates Were Unreasonable, Adopted Yet Another Revenue
                Allocation Methodology, And Permitted WFA To Redesign Its
                SAC Presentation ...............................................................18

        D.      The Board Rejected BNSF's Petition For Reconsideration................21

        E.      Based On WFA's Overhauled SAC Presentation, The Board
                Declared BNSF's Rates To Be Unreasonable.....................................23

        F.      This Court Concluded That The Board's Decision To Adopt
                And Apply Modified ATC Was Arbitrary And Capricious................25

**Page**

      G.     The Board Adhered To Modified ATC On Remand ........................26

      H.     The Board Initiated A Rulemaking Proposing A New Revenue Allocation Method That Is Nearly Identical To The Alternative Proposed By BNSF ........................32

SUMMARY OF ARGUMENT ........................33

STANDING ........................37

ARGUMENT ........................37

I.     STANDARD OF REVIEW ........................37

II.    THE BOARD'S ADHERENCE TO MODIFIED ATC WAS ARBITRARY AND CAPRICIOUS ........................38

      A.     Modified ATC Fails The Board's Own Analytical Framework And Rationale For Revenue Allocation Methodologies ........................38

      B.     The Board's Rationales For Adhering To Modified ATC In This Case Are Arbitrary And Capricious ........................39

            1.     BNSF's arguments against application of Modified ATC in this case are squarely within the scope of this Court's remand ........................41

            2.     BNSF timely raised and consistently pressed its argument that wholesale application of Modified ATC was a wildly disproportionate solution to the problem perceived by the Board and that a superior alternative was available. ........................44

      C.     At A Minimum, The Board's Refusal To Hold This Case In Abeyance Pending The *Rate Reforms* Rulemaking Was Arbitrary And Capricious ........................50

            1.     The Board improperly failed to acknowledge its about-face. ........................51

            2.     The Board's rationales for refusing to hold this case in abeyance cannot withstand scrutiny. ........................54

CONCLUSION ........................61

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*BNSF Railway Co. v. STB*,
   453 F.3d 473 (D.C. Cir. 2006)...................................................9, 11, 12, 13, 57

*BNSF Railway Co. v. STB*,
   526 F.3d 770 (D.C. Cir. 2008)......................................... 3, 8, 9, 11, 12, 16, 18

*BNSF Railway Co. v. STB*,
   604 F.3d 602 (D.C. Cir. 2010)............................................1, 5, 26, 34, 37, 41

*City of Brookings Municipal Telephone Co. v. FCC*,
   822 F.2d 1153 (D.C. Cir. 1987)..................................................................47, 58

*Coal Rate Guidelines, Nationwide*,
   1 I.C.C.2d 520 (1985), *aff'd sub nom. Consolidated Rail Corp. v.*
   *United States*, 812 F.2d 1444 (3d Cir. 1987)................................................7, 8

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009).........................................................................................51

*Farmers Union Central Exchange, Inc. v. FERC*,
   734 F.2d 1486 (D.C. Cir. 1984).................................................................47, 57

*ICC v. Brotherhood of Locomotive Engineers*,
   482 U.S. 270 (1987).........................................................................................37

*Moshea v. NTSB*,
   570 F.3d 349 (D.C. Cir. 2009)........................................................................54

*Motor Vehicle Manufacturers Association v. State Farm Mutual*
   *Automobile Insurance Co.*,
   463 U.S. 29 (1983)...........................................................................................50

\* Authorities upon which we chiefly rely are marked with an asterisk.

**Page(s)**

*Ramaprakash v. FAA*,
    346 F.3d 1121 (D.C. Cir. 2003).....................................................51

*Town of Springfield v. STB*,
    412 F.3d 187 (D.C. Cir. 2005)......................................................37

*United States Telecom Association v. FCC*,
    227 F.3d 450 (D.C. Cir. 2000)......................................................37

## STATUTES

5 U.S.C. § 706(2) ...........................................................................37

28 U.S.C. § 2321 ..............................................................................1

28 U.S.C. § 2342 ..............................................................................1

28 U.S.C. § 2344 ..............................................................................1

49 U.S.C. § 10701(d) .........................................................................7

49 U.S.C. § 10704(a) .........................................................................7

49 U.S.C. § 10704(b) .........................................................................7

49 U.S.C. § 10707(b) .........................................................................7

49 U.S.C. § 11704(b) .........................................................................7

**GLOSSARY**

| | |
|---|---|
| ATC | Average Total Cost |
| BNSF | BNSF Railway Company |
| MSP | Modified Straight-Mileage Prorate |
| PRB | Powder River Basin |
| R/VC | Revenue-to-variable cost |
| SAC | Stand-Alone Cost |
| SARR | Stand-Alone Railroad |
| STB | Surface Transportation Board |
| WFA | Western Fuels Association, Inc. and Basin Electric Power Cooperative, Inc. |

**STATUTES, REGULATIONS, AND RULEMAKINGS**

The relevant materials are reproduced in the attached Addendum ("ADD-").

**JURISDICTIONAL STATEMENT**

On February 18, 2009, the Surface Transportation Board ("STB" or "Board") issued a final order in which it found that BNSF Railway Company's ("BNSF") rates were unreasonably high, prescribed maximum rates, and awarded an estimated $345 million in rate relief to coal shippers Western Fuels Association, Inc. and Basin Electric Power Cooperative, Inc. (collectively "WFA"). *W. Fuels Ass'n & Basin Elec. Power Coop. v. BNSF Ry. Co.*, STB Docket No. 42088 ("*2009 Decision*") (JA-__). BNSF petitioned for review of that decision, and this Court granted the petition in part and remanded. *BNSF Ry. Co. v. STB*, 604 F.3d 602, 613 (D.C. Cir. 2010). On June 15, 2012, the Board issued a final order adhering to its prior decision. *W. Fuels Ass'n & Basin Elec. Power Coop. v. BNSF Ry. Co.*, STB Docket No. 42088 ("*2012 Decision*") (JA-__). BNSF timely filed a petition for review on July 23, 2012. This Court has jurisdiction under 28 U.S.C. §§ 2321, 2342, and 2344.

## STATEMENT OF THE ISSUE

Whether the Board's decision on remand to adhere to the revenue allocation method known as "Modified ATC" was arbitrary and capricious or otherwise contrary to law.

## STATEMENT OF THE CASE

At the heart of this case is a dispute over what methodology the Board should use when determining whether BNSF's rates are unreasonably high. During the course of this litigation, the Board has championed four different approaches. Until its most recent decision, in each instance the Board took deliberate steps to ensure that the latest methodology was applied to the facts in this case. The Board explained in no uncertain terms that it "d[id] not believe it is appropriate to apply flawed or discredited procedures." STB Docket No. 42088, at 20 (served Sept. 10, 2007) ("*2007 Decision*") (JA-__). Yet, in this most recent decision, the Board did an about-face. As explained in more detail below, the Board adhered to its application of a concededly-flawed methodology in this case, even though it acknowledged that a superior alternative suggested by BNSF was available—indeed, even though it promptly initiated a rulemaking proposing to apply that superior alternative to all future cases. The Board failed to offer a reasoned explanation for that decision. It justified its action based solely on an unreasonably restrictive interpretation of the scope of this Court's remand,

assertions of procedural default that have no support in the record, and an arbitrary

declaration that this case must end now because it has simply gone on too long.

The Board initiated this matter upon WFA's October 2004 complaint

alleging that BNSF's freight rail rates were unreasonably high.  In February 2006,

the Board initiated rulemaking proceedings to consider changes to the Board's

method for determining whether challenged rates are too high and ordered this

matter held in abeyance pending the outcome of that rulemaking.  *Major Issues in*

*Rail Rate Cases*, Ex Parte No. 657 (Sub-No.1), STB Docket No. 42095 (Feb. 27,

2006) ("*Major Issues NPRM*") (JA-__).  As the Board explained, it was necessary

to hold this matter in abeyance because several issues that would be addressed in

the rulemaking proceedings, including the method by which the Board allocates

revenue for "cross-over traffic," were "implicated" in this case.  *Id.* at 2 (JA-__).

In October 2006, after notice and comment, the Board promulgated new rules,

including a new revenue allocation method for cross-over traffic called "Average

Total Cost" ("ATC").  *Major Issues in Rail Rate Cases* at 31, STB Ex Parte No.

657 (Sub-No.1) (Oct. 30, 2006) ("*Major Issues Rulemaking*") (ADD-37), *aff'd*,

*BNSF Ry. Co. v. STB*, 526 F.3d 770 (D.C. Cir. 2008) ("*Major Issues Appeal*").

In September 2007, the Board concluded that WFA had failed to make its

case.  *2007 Decision* at 3 (JA-__).  The Board explained that, in reaching that

conclusion, it had discarded ATC (the revenue allocation method it had just

adopted in *Major Issues*) and applied for the first time a newly-minted and never-before-disclosed revenue allocation methodology, which it called "Modified ATC." Rather than terminate the case at that point for WFA's failure of proof, the Board gave WFA the option to redesign its presentation and submit a completely new case in light of the changes that had been made in *Major Issues* and the Board's *sua sponte* adoption of Modified ATC. BNSF filed a petition for reconsideration, objecting to Modified ATC as substantively flawed and challenging the Board's decision to give WFA a second bite at the apple. The Board denied that petition. *See* STB Docket No. 42088 (served Feb. 29, 2008) ("*2008 Recon. Decision*") (JA-__).

WFA then dramatically overhauled its case, in large part to capitalize on advantages that Modified ATC affords complaining shippers. After reviewing WFA's revised presentation, the Board observed that BNSF's "challenged rates are among the lowest transportation rates any utility pays to receive [Powder River Basin] coal," and "appeared on their face to be commercially reasonable." *2009 Decision* at 2 (JA-__). Yet the Board nonetheless concluded, upon applying its new methodologies (including Modified ATC), that BNSF's rates were unreasonably high and ordered an unprecedented $345 million in estimated rate relief to WFA. *Id.* The Board once again rejected BNSF's objections to Modified ATC. *Id.* at 13 (JA-__).

4

BNSF petitioned this Court for review. As pertinent here, BNSF argued that Modified ATC overemphasizes variable costs and thus does not adequately take into account economies of density, which was the entire purpose of adopting ATC in the first place. This Court granted BNSF's petition in relevant part, holding that the Board had failed to provide a reasoned explanation for its adoption of Modified ATC, in light of BNSF's objections. *See BNSF Ry. Co. v. STB*, 604 F.3d 602, 613 (D.C. Cir. 2010) ("*WFA I*").

On remand, a divided Board decided (2-to-1) to adhere to Modified ATC in this case. *2012 Decision* at 12 (JA-__). At the same time, the Board announced that it would soon initiate a rulemaking to propose replacing Modified ATC with a revenue allocation methodology based on an approach BNSF had suggested in this case. The Board nonetheless refused to hold this case in abeyance pending the rulemaking. Even though BNSF had consistently argued—from its first opportunity and repeatedly thereafter—that Modified ATC was a disproportionate remedy and a more tailored approach was available, the Board concluded that BNSF had not sufficiently preserved those arguments and therefore was not entitled to benefit from the new methodology. *Id.* at 11-12 (JA-__-__). The Board also declared that "[l]itigation must come to an end at some point," and "that point has been reached here." *Id.* at 13 (JA-__). The Board consequently left in place its prior order requiring the largest rate reduction in the agency's history, which had

5

resulted from its application of an admittedly inferior revenue allocation methodology.

Commissioner Begeman dissented. She explained that she could not "support maintaining a questionable allocation methodology for this case, while at the same time announcing plans to begin a rulemaking proceeding to develop a superior alternative (based on BNSF's proposal) that would only be applied to future cases." *Id.* at 14 (JA-__). This was particularly unfair, she noted, given that the Board had deemed it "appropriate to hold [this] case in abeyance when the Board was creating original ATC in *Major Issues*," but refused "to do so now for a proceeding to address the very problems posed as a result of ATC and modified ATC." *Id.* at 13 (JA-__).

Shortly after adhering to Modified ATC in this case, the Board initiated the promised rulemaking, proposing to apply its new methodology—Alternative ATC—in all *future* cases. The Board explained that Modified ATC is flawed, and Alternative ATC is superior, for precisely the reasons BNSF had identified in this case. *See Rate Regulation Reforms* at 17-18, STB Ex Parte No. 715 (July 25, 2012) ("*Rate Reforms NPRM*") (ADD-101-02). This petition for review followed.

# STATEMENT OF FACTS

## I.     REGULATORY BACKGROUND

Upon a complaint by an affected shipper, the Board may initiate an administrative proceeding to review the reasonableness of freight rail rates. *See* 49 U.S.C. §§ 10701(d)(1), 10704(a)-(b), 10707(b).  If the Board finds the rate unreasonable, it "may prescribe" the maximum rate the railroad may charge going forward and may order reparations to compensate the complaining shipper for prior overcharges. *Id.* §§ 10704(a)(1), 11704(b).

The Board evaluates the reasonableness of rates under guidelines promulgated in 1985. *See Coal Rate Guidelines, Nationwide*, 1 I.C.C.2d 520 (1985) ("*Guidelines*"), *aff'd sub nom. Consol. Rail Corp. v. United States*, 812 F.2d 1444 (3d Cir. 1987).  The *Guidelines* provide, among other things, that a shipper should not "bear the costs of any facilities or services from which it derives no benefit"—that is, a captive shipper must not be forced to cross-subsidize other shippers. *Guidelines*, 1 I.C.C.2d at 523-24, 534-46.  The *Guidelines* set out a "Stand-Alone-Cost" ("SAC") test for determining whether there is an impermissible cross-subsidy.

### A.     The Stand-Alone-Cost Test

To meet its burden under the SAC test, a complaining shipper designs a hypothetical stand-alone railroad ("SARR") that is optimally efficient and serves

7

the traffic to which the challenged rate applies, plus any other traffic selected by the complainant. *Major Issues Appeal*, 526 F.3d at 777. A complainant has "broad flexibility to develop the least costly, most efficient plant" and to select the traffic group that will be served by its SARR. *Guidelines*, 1 I.C.C.2d at 543-44. If the Board concludes that the SARR's projected total revenues exceed its projected total costs (including a reasonable rate of return on the investment in the SARR), then rate relief may be ordered. *See Major Issues Rulemaking* at 8 (ADD-14).

### B.    Cross-Over Traffic

The primary issue in this case involves how the Board determines the SARR's projected revenues for purposes of applying the SAC test. The SARR's projected revenues are generally determined based on the real-world rates charged by the defendant railroad to the traffic group selected by the complainant in its SAC presentation. Therefore, the revenue calculation is straightforward if the complainant performs a full SAC analysis that models "origin-to-destination service for the entire traffic group." *Major Issues Rulemaking* at 24 (ADD-30). In that case, computing the SARR's projected revenues is simply a matter of adding up the revenues based on real-world rates paid by the traffic group served by the SARR.

"[A] problem arises," however, when the complainant designs a SARR that relies on "cross-over traffic"—*i.e.*, traffic that travels over the SARR for only a

portion of its journey and uses the real-world railroad for the remainder. *Major Issues Appeal*, 526 F.3d at 782. Although the use of cross-over traffic has become customary in SAC presentations, it raises concerns because the Board must figure out "how to allocate the total revenues the railroad earns from that cross-over traffic between the facilities replicated by the SARR and the residual network of the [defendant] railroad needed to serve that traffic." *Major Issues Rulemaking* at 24 (ADD-30); *see also BNSF Ry. Co. v. STB*, 453 F.3d 473, 483 (D.C. Cir. 2006) ("*Xcel*"). That process of allocating revenue inevitably introduces "imprecision into the SAC analysis." *Xcel*, 453 F.3d at 482 (citation omitted); *Major Issues Rulemaking* at 32 (ADD-38) ("Some imprecision is inevitable ….").

Take the following example. Suppose a real-world railroad transports coal that originates in Wyoming, passes through terminals in Omaha and Kansas City, and terminates at a power plant in Springfield, Missouri. If the complainant shipper wishes to include this traffic group in its SAC presentation, it has the option of designing a SARR that services only part of the Wyoming-to-Springfield route. The complainant may decide, for instance, that the SARR will service only the portion of the traffic's journey from Wyoming to Omaha, with the defendant railroad providing service for the remainder of the journey from Omaha to Springfield. In this hypothetical world, the traffic travels partially on the SARR and partially on the defendant railroad; in other words, it "crosses over" from the

SARR to the defendant railroad. In Board parlance, the Wyoming-to-Omaha part of the journey is referred to as the "on-SARR" segment; the Omaha-to-Springfield part is referred to as the "off-SARR" segment.

In the real world, the defendant railroad simply charges a single rate and receives the resulting revenues for the entire movement (Wyoming to Springfield). For purposes of the SAC test, however, the Board must decide how to divide the real-world revenue between the on-SARR and off-SARR portions of the cross-over movement. Because there is no real-world basis for such a division of revenues, there is not only the promise of imprecision but also the risk of distortion. Since revenue allocation is supposed to be based on comparative costs, distortion occurs if a methodology allocates to the SARR more revenue than is justified by its relative portion of the total costs for the cross-over movement. This distortion biases the SAC analysis in favor of a complainant shipper that chooses to have its SARR replicate only a small portion of the cross-over movement rather than provide the entire through service. The Board therefore has consistently stressed the importance of applying a revenue allocation methodology that does not "introduc[e] bias." *Major Issues Rulemaking* at 24, 35 (ADD-30, 41).

The goal of impartiality is critical because the complainant may design its SARR and select its traffic group however it wishes. Under the SAC test, the complainant's sole objective is to design a SARR that will provide projected total

10

revenues in excess of its projected total costs (and thus show that the rate it pays is too high). In order to achieve that objective, any rational complainant would seek to have as much revenue as possible allocated to the on-SARR portion of a cross-over movement.

### C.    In 2006, The Board Adopted The Average Total Cost ("ATC") Methodology For Allocating Cross-Over Traffic Revenues

Although the Board has permitted the use of cross-over traffic since 1994, it has struggled to settle on an approach for allocating revenues from such traffic. Until 2006, the Board apportioned cross-over traffic revenues based on mileage (the "Modified Straight-Mileage Prorate," or "MSP," method). *Major Issues Rulemaking* at 25 (ADD-31). Under that approach, revenues were generally allocated in proportion to the distance travelled on-SARR versus off-SARR. For example, "if 60 percent of a shipper's route was on-SARR and 40 percent was off-SARR, roughly 60 percent of its revenue contribution would be allocated to the SARR" and 40 percent to the defendant railroad. *Major Issues Appeal*, 526 F.3d at 782. That methodology was simple but flawed, as it failed to account for economies of density—one of "the defining characteristic[s] of the railroad industry." *Major Issues Rulemaking* at 25 (ADD-31). "Economies of density" refers to "the principle that as the density of traffic increases over a stretch of rail, average costs diminish, at least initially." *Xcel*, 453 F.3d at 483 (citation omitted); *see Major Issues Appeal*, 526 F.3d at 782.

11

In order to understand why the MSP approach was flawed, it is important to appreciate the difference between "variable costs" and "fixed costs," and the relationship of each to economies of density. "Variable costs are those costs that increase as traffic over the railroad increases—for example, the cost of fuel." *Major Issues Appeal*, 526 F.3d at 773. Variable costs are incurred only as a result of a given traffic movement, and they do not vary for a particular movement based on the level of traffic. Accordingly, average variable costs are independent of traffic density. Fixed costs, by contrast, are costs that the railroad incurs regardless of the level of traffic on the line—that is, they are not attributable to or dependent on any particular movement. Therefore, responsibility for the fixed costs of a particular line segment are shared among all the movements on that segment. This is where economies of density come in to play: the higher the traffic volumes on a segment, the lower the average fixed costs for each unit of traffic on that segment (up to a point). *See, e.g.*, *id.* at 782-83 (providing a hypothetical example that illustrates this phenomenon).

In 2006, this Court criticized the Board's MSP approach for overemphasizing variable costs (through the proxy of mileage) and its concomitant failure to "take into account economies of density." *Xcel*, 453 F.3d at 483. The Court warned that if the Board were "presented with a model that took account

12

both of the economies of density and of the diminishing returns thereto, a decision to adhere to its MSP model would be on shaky ground indeed." *Id.*

Around the same time, the Board undertook an extensive rulemaking to address several "major issues regarding the proper application of the [SAC] test in rail rate cases," including (as pertinent here) the method for allocating revenues from cross-over traffic. *Major Issues NPRM* at 2 (JA-__). After receiving comments from more than 20 parties, including the U.S. Department of Transportation, the Board promulgated rules that changed various aspects of the SAC test. *Major Issues Rulemaking* at 4 (ADD-10). Most relevant here, the Board adopted a new approach for apportioning cross-over traffic revenue—the Average Total Cost method ("ATC"). *Id.* at 31 (ADD-37).

When addressing these revenue allocation issues, the Board observed that "the goal in allocating revenue from cross-over traffic should be to ensure that a truncated SAC analysis using cross-over traffic will approximate the outcome of a full SAC analysis, which provides origin-to-destination service for the entire traffic group." *Id.* at 24 (ADD-30). Because a "full SAC analysis compares the total SAC costs incurred to serve the selected traffic against the total revenues the carrier is expected to earn from that traffic group," the Board explained that its "objective" was to select a revenue allocation methodology that "reflects, to the

13

extent practicable, the carrier's relative average costs of providing service over the two segments" (on-SARR and off-SARR).  *Id.* at 24-25 (ADD-30-31).

The Board concluded that "MSP, while simple and practical to apply, does not meet [that] objective."  *Id.* at 25 (ADD-31).  As the Board explained, because MSP "allocates revenues according to a crude estimate of the relative *variable* costs of hauling the traffic over the relevant segments, rather than the *total* costs," it "fails to take into account the defining characteristics of the railroad industry— economies of scale, scope and density."  *Id.*  Because MSP does not account for economies of density, it "allocates too much revenue to high-density lines, and not enough to lighter-density lines."  *Id.* at 35 (ADD-41).  The result, the Board acknowledged, biased the analysis in favor of shipper complainants, who were incentivized to select cross-over movements in which the SARR replicates only the high-density segments of the line (thereby inflating the revenues allocated to the SARR and creating the appearance of an overcharge).

Taking heed of this Court's admonition in *Xcel*, the Board adopted a revenue allocation methodology that properly reflected economies of density: the ATC method.  Under that approach, the Board would use the defendant railroad's system-wide average variable and fixed costs, and factor in the density and length of the relevant on- and off-SARR segments, to calculate the railroad's average total costs for each segment.  Revenues would be allocated "in proportion to the average

14

total cost of the movement on- and off-SARR." *Id.* at 26 (ADD-32). To take a simple example, imagine a SAC presentation where the average total cost of the on-SARR segment of a cross-over movement is $40 and the average total cost of the off-SARR segment is $60. If the total revenue for that cross-over movement is $200, then $80 (or 40% of the revenue) would be allocated to the SARR and $120 (or 60%) would be allocated to the defendant railroad.

The Board articulated several interrelated virtues of ATC. The Board explained that ATC successfully takes account of economies of density because—unlike MSP—it is centered on average *total* costs rather than average *variable* costs. *Id.* at 33-35 (ADD-39-41). Because ATC allocates revenue based on average *total* costs, it better maintains "the relationship between revenues and costs that would exist in a full SAC analysis," which compares total revenues and total costs. *Id.* at 25 (ADD-31). The Board found that ATC would "level the playing field" by "ensur[ing] that the result more closely aligns with what a larger, more cumbersome SAC analysis would show," "[r]ather than biasing the result towards the over-assignment of contribution to the on-SARR segments," as was the case with MSP. *Id.* at 35-36 (ADD-41-42).

This Court upheld the Board's adoption of ATC, explaining that "[b]ecause average total cost for a given segment of rail decreases as density increases (up to a point), basing the revenue allocation in part on average total costs solves the

15

problem that we identified in [*Xcel*]"—namely, the need for a methodology that appropriately takes into account both economies of density and their diminishing nature. *Major Issues Appeal*, 526 F.3d at 782-84.

## II. PROCEDURAL HISTORY

### A. WFA Filed A Rate-Reasonableness Complaint

Coal from Wyoming's Powder River Basin ("PRB") is highly sought-after by utility companies because it tends to have low sulfur content. *2007 Decision* at 2 (JA-__). From 1984 to 2004, BNSF transported coal from the PRB to WFA's coal-fired power plant at Moba Junction, Wyoming, under a long-term contract. Under that contract, the transportation rate gradually decreased from $4 per ton in 1984 to $3 per ton in 2004. *Id.* When the parties were unsuccessful negotiating a replacement contract, BNSF established a common carrier rate of $6 per ton, "one of the lowest transportation rates any utility pays to acquire PRB coal," and "low on a dollar-per-ton basis" in comparison to rates paid by other close-by utilities. *Id.*

WFA nonetheless filed a complaint with the Board asserting that the rate was unreasonable. Even though "railroad costs increased approximately 60% and demand for PRB coal production increased by 500%" during the life of WFA's contract with BNSF, WFA contended that its rate should only be $3.10—nearly

25% lower than the initial contract rate negotiated in 1984. *Id.* WFA sought rate relief of more than $20 million per year through the year 2024. *Id.*

### B.      The Board Held This Case In Abeyance Pending *Major Issues*

In February 2006, after WFA submitted its SAC presentation, the Board initiated its *Major Issues* rulemaking and held WFA's case in abeyance pending the outcome of that proceeding. The Board explained that it was necessary to hold this matter in abeyance because several issues addressed by the proposed rulemaking, including revenue allocation for cross-over traffic, were "implicated" in this case. *See Major Issues NPRM* at 2 (JA-__).

In October 2006, the Board promulgated its *Major Issues* rules and announced that its new revenue allocation methodology (ATC) would apply to pending cases like this one. *Major Issues Rulemaking* at 75 (ADD-81). The Board explained that ATC was "designed in large part to improve the reliability of [the] SAC analysis." *Id.* at 75-76 (ADD-81-82). Moreover, because WFA was seeking rate prescriptions extending until 2024, continuing to apply MSP for cross-over traffic in this case would create the risk of "perpetuat[ing] a flawed approach long into the future." *Id.* at 76 (ADD-82). This Court affirmed the Board's decision, explaining that "it was reasonable for the Board to immediately discard" MSP "and apply its new rule to pending cases" given "that the new methodology was 'designed in large part to improve the reliability of [the SAC] analysis, and given

17

the possibility of rate prescriptions of nearly 20 years.'" *Major Issues Appeal*, 526 F.3d at 784 (citation omitted).[1]  WFA and BNSF then supplemented their evidence in response to *Major Issues*.

### C.     The Board Concluded That WFA Failed To Prove That BNSF's Rates Were Unreasonable, Adopted Yet Another Revenue Allocation Methodology, And Permitted WFA To Redesign Its SAC Presentation

After considering WFA's supplemented SAC presentation, the Board concluded that the challenged rates were not unreasonable.  *2007 Decision* at 2 (JA-__).  Far from it: through the year 2024, the revenues generated by the traffic on the SARR were projected to fall short of the SARR's total costs by approximately $263 million.  *Id.* at 139 (JA-__).  The Board accordingly held that WFA "is not being forced to cross-subsidize other parts of BNSF's broader rail network."  *Id.* at 2 (JA-__).

In adjudicating the case, the Board jettisoned the ATC methodology it so recently adopted after extensive public comment and careful consideration in *Major Issues*.  Indeed, this case was the Board's very first opportunity to apply ATC—yet it refused to do so.  In explaining its retreat from ATC, the Board noted

---

[1]  While that appeal was pending in this Court, the Board rejected WFA's renewed plea to apply the flawed MSP approach in this case, explaining that it could not "use now-discredited procedures to resolve a dispute involving millions of dollars and establish rate prescriptions that would extend for two decades." *2007 Decision* at 3 (JA-__); *see id.* at 20 (JA-__) ("We do not believe it is appropriate to apply flawed or discredited procedures ….").

that WFA's selected traffic group "include[d] considerable traffic with total revenue either below or barely above variable cost." *Id.* at 14 (JA-__).[2]  Because the off-SARR portions of cross-over movements had lower traffic densities that would result in a greater allocation of revenues under ATC, the Board noted that applying ATC would have the "practical effect" of driving the revenue-to-variable cost ("R/VC") ratio of the highest-density on-SARR portions of the lower revenue movements below 100%. *Id.*  In other words, the revenues allocated under ATC to the on-SARR portion of low revenue cross-over movements would be insufficient to cover their variable costs.  The Board characterized this as "an illogical and unintended result" that it had not anticipated during the *Major Issues* rulemaking.

In light of this concern, the Board *sua sponte* adopted and applied a new revenue allocation methodology—without any input from the parties, and without soliciting comments from the public (as part of a rulemaking or otherwise).  The new approach, which would become known as "Modified ATC," has two steps.  First, revenues are assigned to the on-SARR and off-SARR portions of a cross-over movement equal to their respective *variable* costs.  *Id.* at 14 (JA-__).  Second, any remaining revenues are allocated between the SARR and defendant railroad in proportion to the relative average *total* costs of serving the on- and off-SARR

---

[2]  WFA's decision to include such traffic was driven by the incentives that existed under the old MSP approach, "which over-allocated revenue to the SARR."  *2007 Decision* at 20 (JA-__).

19

segments.  *Id.*  In other words, instead of allocating revenues to the on- and off-SARR segments based solely on average total costs, Modified ATC allocates revenues initially based solely on *variable* costs, and only then allocates any remaining revenues in proportion to average total costs (*i.e.*, average variable costs plus average fixed costs).[3]  "Modified ATC" is therefore a misnomer, as it bears no direct relationship to average total costs and thus represents a fundamental shift from the principles set forth in *Major Issues*.

Having found the challenged rates reasonable on their face and under the SAC test (using the newly-adopted Modified ATC method for cross-over traffic), the Board nonetheless did not terminate these proceedings.  Instead, it decided to give WFA a second bite at the apple.  The Board acknowledged that it generally does *not* "permit complainants to redesign their case in light of subsequent Board decisions."  *Id.* at 3 (JA-__).  It felt, however, that "fairness dictate[d] that WFA have an opportunity to modify its SAC presentation in light of the new revenue allocation methodology."  *Id.* at 20 (JA-__); *see id.* (observing that "the change from MSP to [Modified] ATC would affect the basic design of a SAC case").

---

[3]   If total revenues do not exceed the total variable costs of the cross-over movement, revenue is then allocated to the on-SARR and off-SARR segments in accordance with the entire movement's R/VC ratio.  *2007 Decision* at 14 n.18 (JA-__).

### D. The Board Rejected BNSF's Petition For Reconsideration

BNSF filed a petition for reconsideration challenging, as relevant here, the Board's decision to adopt and apply Modified ATC. *See* BNSF Petition for Reconsideration at 2-3, 9-19, STB Docket No. 42088 (Oct. 22, 2007) ("BNSF PFR") (JA-__). BNSF explained that Modified ATC is fundamentally flawed because "economies of density are reflected in average total costs, not average variable costs," and Modified ATC thus "impermissibly dilutes the impact of density by effectively double-counting variable costs." *Id.* at 16 (JA-__). BNSF argued that Modified ATC's overemphasis on allocating revenues based on variable costs "repudiate[d] the fundamental objective" of the Board's *Major Issues* rulemaking and transgressed this Court's warning in *Xcel*—namely to adopt a methodology that takes account of economies of density. *Id.* at 11 (JA-__). And to the extent the Board fails to account for the effect of traffic density on cost, it will incentivize SAC presentations loaded with cross-over traffic that have high density on the SARR segments and yield results biased in favor of the complaining shipper. *Id.* at 12 (JA-__) (explaining that Modified ATC, like the discredited MSP approach, "systematically disfavors the [off-SARR] portion of a movement and reintroduces the bias in favor of a SARR using cross-over traffic that ATC was designed to eliminate").

21

In response to the Board's claim that this departure from ATC was nevertheless necessary because it would be "illogical" to allocate revenue in a way that may not cover the variable costs of the on-SARR portion of a cross-over movement, BNSF made two alternative arguments. First, BNSF argued that, because the shipper chooses which traffic to include on the SARR, there is nothing illogical about applying original ATC to low-rated traffic and, therefore, the Board's rationale could not justify the shift to Modified ATC and concomitant sacrifice of accuracy. BNSF PFR at 17-19 (JA-__-__). Second, BNSF argued that, "even if the Board's concern about the effect of ATC on low-rated [*i.e.*, lower-revenue] traffic justified suspension of the average total cost approach *on that traffic*, there is no conceivable justification for applying the modified ATC methodology *to all cross-over traffic*." *Id.* at 3 (emphasis added) (JA-__). BNSF pointed out that, for cross-over movements with revenues "well in excess of variable costs," "there is no risk that ATC will allocate to the SARR less than [its projected] variable costs." *Id.* at 19 (JA-__). Instead, the only effect of applying Modified ATC to such traffic is "to dilute the impact of density on relative on-SARR and off-SARR costs." *Id.* at 3 (JA-__); *see id.* at 19 ("Applying the modified ATC to high-rated traffic therefore unnecessarily distorts the cost relationship between the on-SARR and off-SARR segments by diluting the impact

22

of density on total costs.") (JA-__).  In other words, the Board's solution was wildly disproportionate to the "problem" it perceived.

The Board denied the petition.  The Board did not dispute that Modified ATC fails to reflect relative economies of density.  Nor did it explain why a deviation from ATC was necessary with respect to *high-rated* cross-over traffic with revenues that comfortably exceed variable costs.  The Board merely repeated its non-responsive mantra that it "would not be rational" for the on-SARR portion of a cross-over movement of low-rated traffic to receive revenues below its variable costs.  *2008 Recon. Decision* at 4 (JA-__).

### E.     Based On WFA's Overhauled SAC Presentation, The Board Declared BNSF's Rates To Be Unreasonable

Having lost on its first try, WFA took full advantage of the Board's invitation to redesign its SAC presentation.  With respect to cross-over traffic, WFA made wholesale changes.  WFA eliminated almost all the movements that had caused the Board to depart from original ATC in the first place—that is, it dropped almost all low-rated cross-over traffic from its SARR.

In response, BNSF once again urged the Board not to apply Modified ATC in this case.  BNSF reiterated that "modified ATC significantly biases the revenue allocation in favor of the SARR because it no longer allocates revenues in proportion to total costs" and, therefore, no longer properly reflects economies of density.  Third Supplemental Reply Evidence of BNSF Railway Company, STB

23

Docket No. 42088, at I-21, I-23 (July 14, 2008) ("BNSF 3SR") (citing BNSF PFR at 11-16) (JA-__, __).  BNSF also pointed out that, even under the Board's own flawed rationale for adopting Modified ATC, there was no longer any reason to apply it in this case, given WFA's decision to omit low-rated cross-over traffic from its revised traffic group.  If the Board continued to apply Modified ATC, BNSF explained, it "would be correcting a problem that no longer exists."  *Id.* at I-22 (JA-__); *see also id.* at III.A-16 (JA-__).

The Board rejected BNSF's objections to the continued application of Modified ATC.  The Board did not dispute that the new methodology fails adequately to account for economies of density.  Nor did it find that application of Modified ATC was sensible on the facts of this case.  Rather, the Board merely stated:  "We seek a uniform revenue allocation method and remain convinced that the modification adopted in the *Sept. 2007 Decision* is reasonable and necessary to preserve the integrity of the ATC approach."  *2009 Decision* at 13 (JA-__).

After applying Modified ATC to WFA's revised presentation, the Board concluded that WFA had now "succeeded in making its case."  *Id.* at 2 (JA-__).  Although the Board still acknowledged that "the challenged rates are among the lowest transportation rates any utility pays to receive PRB coal," and "appeared on their face to be commercially reasonable," it found that the rates "exceed by a wide margin the level BNSF is permitted to charge under the SAC test."  *Id.*  In sharp

24

contrast to the approximately $263 million revenue shortfall the Board had originally projected after WFA's first SAC presentation, the Board now found that WFA's new SARR enjoyed $421 million in excess revenues, a swing of approximately $684 million. *See id.* at 29 (JA-__). Apparently untroubled by the massive difference between the 2007 and 2009 outcomes, the Board ordered a "roughly 60% reduction" in the challenged transportation rate. *Id.* at 2 (JA-__). The Board estimated that, based on reparations plus rate prescriptions extending through 2024, WFA would receive rate relief of approximately $345 million (in current dollars). This remains "the single largest reduction in rail rates ever ordered by [the] agency." *Id.*

## F. This Court Concluded That The Board's Decision To Adopt And Apply Modified ATC Was Arbitrary And Capricious

BNSF filed a petition for review in this Court, arguing (as pertinent here) that the Board's decision to adopt and apply Modified ATC was arbitrary and capricious. As it had before the Board, BNSF explained to this Court that, "by first allocating to the SARR revenues sufficient to recover the incumbent's variable costs, and not reflecting any economies of density until the second step, Modified ATC fails adequately to account for the effects of economies of density on and off-SARR." Final Brief of Petitioner, *BNSF Ry Co. v. STB*, Nos. 09-1234, 1190, 1092 (D.C. Cir. Dec. 28, 2009), at 51 ("*WFA I* Opening Brief"). Because of this failure, BNSF explained, Modified ATC "tends to overallocate revenues to the SARR."

25

*Id.* at 51-52.  By "double-count[ing] variable costs," Modified ATC "biases the allocation of cross-over revenues in favor of the complaining shipper."  *Id.* at 54-55.

BNSF further explained, as it had before the Board, that even if the problem perceived by the Board was a legitimate concern as to low-rated cross-over traffic, it did not justify the abandonment of original ATC as to *all* cross-over movements, including on-SARR portions of cross-over movements that entail no risk of R/VC ratios falling below 100%.  *Id.* at 57-58.  Accordingly, the Board had not provided any rational "explanation for persisting to apply the modified ATC approach [to this case] after WFA had overhauled its case to eliminate [nearly] all low-rated traffic."  *Id.* at 25.

This Court agreed with BNSF that the Board had failed adequately to respond to "BNSF's double-counting objection to modified ATC," and remanded for the Board to do so.  *WFA I*, 604 F.3d at 613.

### G.     The Board Adhered To Modified ATC On Remand

**1.**     On remand, BNSF again detailed the flaws with Modified ATC. BNSF explained, once again, that because Modified ATC places too much emphasis on variable costs, it fails adequately to reflect economies of density and thereby biases the analysis in favor of complaining shippers, like WFA, that utilize cross-over traffic on high-density portions of a railroad's network.

26

BNSF also explained, once again, why the Board's justification for tolerating the bias introduced by wholesale application of Modified ATC is unreasonable: "[E]ven if the Board's concerns about the allocation of revenues under ATC on low-rated traffic were valid," the Board's decision to apply Modified ATC represented a significant overreaction to a relatively minor problem. Comments of BNSF Railway Company on Remand at 3, STB Docket No. 42088 (Nov. 22, 2010) ("BNSF Comments on Remand") (JA-__). "[M]odified ATC increases the SARR revenues for *every cross-over movement*" in WFA's revised SAC presentation, "including the vast majority of movements that already received revenues under original ATC that exceed variable costs." *Id.* at JVS-7 (JA-__). Because WFA's revised SAC presentation contained *only three* cross-over movements for which, under original ATC, revenue allocated to the on-SARR portion of the movements would not cover their variable costs, *id.* at 27-28 (JA-__), continuing to apply Modified ATC in this case would be like using a cannon to stop a feeding mosquito.

For those three movements, the total "revenue shortfall in 2005 was very small—just under $600,000 in the aggregate" (a less than 0.3 percent "shortfall"). *Id.* at 28 (JA-__). But Modified ATC "shifted more than $2.7 million on those [three] movements" *for 2005 alone*—$2.1 million more than was necessary to remedy the perceived problem. *Id.* Even more troublesome, Modified ATC

27

shifted an additional $9.4 million in revenue to WFA's SARR for cross-over movements that *fully covered their variable costs* under original ATC. *Id.* at 28-29 (JA-__-__). Thus, application of Modified ATC resulted in WFA's SARR receiving $12 million in additional revenues *for 2005 alone*, even though the alleged problematic shortfall under original ATC was a mere $600,000. Almost three-fourths of that revenue windfall was attributable to cross-over traffic that did not even present the concern the Board identified. And that unjustified and unjustifiable result would be perpetuated and compounded annually over a *twenty-year period*.

Reiterating the points it had made since its 2007 Petition for Reconsideration, BNSF argued that there was "'no reason to apply the modified ATC methodology to all cross-over traffic, including high rated traffic.'" *Id.* at 30 (quoting BNSF PFR at 19) (JA-__). It outlined an alternative methodology that would be a "far superior" way "to eliminate any cross-subsidy concerns on low-rated traffic without creating the distortion in revenue allocation from high-rated traffic that results from double-counting variable costs on that traffic." *Id.* at 30-31 (JA-__-__). In a nutshell, BNSF explained that the Board could use original ATC as an initial matter, after which it could allocate additional revenues to the SARR based on relative variable costs, but only for those cross-over movements for which revenues allocated under original ATC were below the defendant's variable

costs.  *Id.*  This alternative approach would "deal with the problem of below-cost revenues by focusing *exclusively* on the movements that receive revenues below the incumbent's variable costs."  *Id.* at 31 (JA-__).

**2.**  In a divided (2-to-1) opinion, the Board nevertheless decided to "continue to use modified ATC in this case."  *2012 Decision* at 6 (JA-__).  According to the majority, a revenue allocation methodology must "attempt to accommodate" "two competing principles": (1) the methodology "should take into account the important role that economies of density play in any cost-based revenue allocation approach"; and (2) "it should not create the implausible result of driving the revenue allocation below variable costs."  *Id.* at 10 (JA-__).  The majority acknowledged that "modified ATC does not give the same weight to economies of density as original ATC did," but found that "modified ATC strikes a more appropriate balance than original ATC" because the latter could potentially "drive revenue allocation below variable costs," even if for only a handful of the on-SARR portions of cross-over movements.  *Id*. at 9-10 (JA-__-__).

The majority then addressed BNSF's argument that, even if there were a legitimate problem with original ATC, Modified ATC did not represent an appropriately tailored response to that problem.  *Id.* at 11 (JA-__).  Even though this argument had been part-and-parcel of BNSF's objection to the application of Modified ATC all along, including in this Court (*see, e.g.*, BNSF PFR at 3, 19 (JA-

29

__, __); *WFA I* Opening Brief at 57-58), the majority concluded that it was somehow outside the scope of this Court's remand. The Board nonetheless decided to exercise its discretion "to broaden the issues on remand" and explained that it would consider these arguments, but would "look to the statutory reopening standard" to "guide [its] decision-making." *2012 Decision* at 11 (JA-__).

As relevant here, the Board concluded that BNSF was not entitled to relief under that standard because it had not previously advanced these arguments. *Id.* at 11-12 (JA-__-__). According to the majority, when BNSF sought reconsideration of the *2007 Decision*, it "urged the Board to return to original ATC" but "did not argue that modified ATC was a vastly disproportionate response to the problem." *Id.* at 12 (JA-__). Although the majority acknowledged that BNSF previously "alluded to the alternative [methodology] that it has now identified on remand," it faulted BNSF for not "present[ing] that alternative in *adequate detail*." *Id.* (emphasis added).

In a coda worthy of O. Henry, the majority conceded that there may "be other approaches that could better accommodate the two competing principles" it had identified. *Id.* Indeed, the majority announced that the Board was "planning to begin a rulemaking proceeding to consider whether a methodology *similar to BNSF's alternative ATC* might be just such an approach." *Id.* (emphasis added). The Board declined, however, to hold this case in abeyance "while that rulemaking

runs its course." *Id.*  The majority noted that if the Board were to hold this case and apply "something like BNSF's alternative ATC," WFA might be entitled to revise its SARR yet again.  *Id.* at 12-13 (JA-__-__).  Apparently frightened by that possibility, the majority declared that "[l]itigation must come to an end at some point," and "that point has been reached here."  *Id.* at 13 (JA-__).

Commissioner Begeman dissented.  She explained that, unlike the majority, she could not "ignore that valid concerns have been raised over" the use of Modified ATC—concerns that BNSF had "raised *throughout the course of this case*, not merely on remand."  *Id.* (Begeman, dissenting) (emphasis added) (JA-__).  She further explained that she could not "support maintaining a questionable allocation methodology for this case, while at the same time announcing plans to begin a rulemaking proceeding to develop a superior alternative (based on BNSF's proposal) that would only be applied to future cases."  *Id.* at 14 (JA-__).  This was particularly unfair, she noted, given that the Board had deemed it "appropriate to hold [this] case in abeyance when the Board was creating original ATC in *Major Issues*," but refused "to do so now for a proceeding to address the very problems posed as a result of ATC and modified ATC."  *Id.* at 13 (JA-__).

31

### H.    The Board Initiated A Rulemaking Proposing A New Revenue Allocation Method That Is Nearly Identical To The Alternative Proposed By BNSF

On July 25, 2012—only a few weeks after it issued the *2012 Decision*—the Board initiated a rulemaking that proposed to adopt a revenue allocation methodology ("Alternative ATC") that is nearly identical to the approach proposed by BNSF. *See Rate Reforms NPRM* at 17-18 (ADD-101-02). Alternative ATC would first apply original ATC to all cross-over movements. *Id.* at 17 (ADD-101). "A second step would then be performed to ensure that the revenue allocated to both the facilities replicated by the SARR and those of the residual defendant carriers would not be driven below the … variable costs for the movement over those segments." *Id.* at 17-18 (ADD-101-02). The Board acknowledged that "this alternative approach" was first "brought to [its] attention" by BNSF in this case. *Id.* at 18 (ADD-102). The Board further acknowledged that its proposal was quite similar to the method proposed by BNSF. *Id.* at 18 n.12 (ADD-102). Invoking precisely the same argument that had been pushed by BNSF, the Board explained that its proposed rule was superior to Modified ATC because it "avoids driving the revenue allocation below variable costs while giving *more weight to the important*

*role that economies of density should play* in any cost-based revenue allocation approach." *Id.* at 18 (ADD-102) (emphasis added).[4]

## SUMMARY OF ARGUMENT

The Board's decision to adhere to Modified ATC on remand—and therefore leave in place an unprecedented order awarding WFA an estimated $345 million in reparations and reduced rates—was arbitrary and capricious.

Modified ATC flunks the Board's own criteria for what constitutes a proper revenue allocation methodology. As BNSF has explained throughout these proceedings, Modified ATC significantly dilutes the impact of economies of density because it places too much emphasis on allocating revenues based on variable costs. This flaw is particularly acute with respect to cross-over traffic that already covers its variable costs under original ATC. For that traffic, which constitutes the vast majority of cross-over movements in WFA's presentation, Modified ATC is completely unnecessary to satisfy the Board's concern about not driving revenues below variable costs. Yet it does significant violence to the Board's other guiding principle (and this Court's admonition in *Xcel*) that a revenue allocation methodology must properly account for economies of density.

---

[4]   The Board is currently receiving comments on its proposed rulemaking. Final comments (the rebuttal submissions) are due on January 7, 2013. *See Rate Reforms NPRM* at 20 (ADD-104).

33

The Board does not defend the perpetuation of Modified ATC in this case on the merits. It cannot do that, because it *agrees* with BNSF that Modified ATC is a flawed methodology when applied to the vast majority of cross-over traffic in WFA's presentation, which already covers its variable costs. As to such movements, Modified ATC double counts variable costs and therefore dilutes the impact of economies of density. The Board also agrees that a superior alternative is available—one based on the model endorsed by BNSF in this very proceeding—that gives "more weight to the important role that economies of density should play in any cost-based revenue allocation approach" and at the same time satisfies the Board's desire to ensure that sufficient revenues are allocated to cover the variable costs for the on-SARR portion of cross-over movements. *Rate Reforms NPRM* at 18 (ADD-102). Instead, the Board resorted to a pair of strained procedural maneuvers to justify its decision. Neither has any basis in fact or law.

First, the Board characterized much of BNSF's argument as "outside the scope" of this Court's remand. That determination, however, rests on an unduly crabbed reading of this Court's decision in *WFA I*. This Court remanded the case to the Board so that it could "address BNSF's double-counting objection to modified ATC." *WFA I*, 604 F.3d at 613. Contrary to the Board's assertion, BNSF's argument that Modified ATC represented a disproportionate response to the perceived defect of original ATC is—and always has been—part-and-parcel of

BNSF's "double counting" objection.   Indeed, the very reason BNSF has contended that Modified ATC is a "disproportionate remedy" is because it *unnecessarily* gives too much emphasis to revenue allocation based on variable costs at the expense of economies of density.   The Board's attempt to classify BNSF's disproportionate remedy critique as outside the scope of this Court's remand was artificial and arbitrary.

Second, the Board claimed that BNSF had not previously advanced its argument that Modified ATC was a disproportionate remedy for the problem perceived by the Board with respect to original ATC.   And while the Board acknowledged that BNSF had "alluded to" a better alternative, it claimed that BNSF had not explained the alternative methodology in sufficient detail.   The Board's forfeiture findings are based on a distortion of the administrative record. BNSF has from the outset—and consistently—argued that Modified ATC is not properly tailored to remedy the perceived problem.   Indeed, that has been an essential part of BNSF's objection to Modified ATC since the 2007 Petition for Reconsideration.   And BNSF's argument that Modified ATC is wildly *overinclusive* obviously encompasses the proposition that the Board should do something *less inclusive.*  It was not BNSF's burden to go further and articulate for the agency a ready-made solution to the problem it identified; but in any event it did so, and in enough detail for the Board to model its new "Alternative ATC"

methodology on BNSF's proposal. In short, the Board's claims of waiver are entirely meritless. Because the Board offers nothing else in defense of its stubborn adherence to Modified ATC in this case, its decision must be vacated.

At a bare minimum, the Board should have held this case in abeyance pending the *Rate Reforms* rulemaking. The Board previously stayed this case in materially indistinguishable circumstances (pending a rulemaking that planned to change the methodology for allocating revenues from cross-over traffic), yet failed even to acknowledge its about-face here. Other than its meritless forfeiture theory, the Board's only rationale for refusing to hold this case in abeyance is exasperation with the longevity of this dispute. But it will not suffice for an agency to apply an admittedly flawed methodology—that could impact the ultimate relief awarded by tens or even hundreds of millions of dollars—merely because it is tired of litigating the case. Indeed, that is a particularly inappropriate defense here, where the Board—not BNSF—was responsible for the protracted delays in this case. The Board's refusal to hold this case is especially jarring, and unfair, because its new "Alternative ATC" approach, which will be applied in future cases, is based on BNSF's own proposal. If upheld, the Board's adherence to Modified ATC in this case may effect a wealth transfer to the tune of hundreds of millions of dollars, for no better reason than the Board's arbitrary decision that "now" is the time that this case "must come to an end."

36

## STANDING

BNSF is obviously aggrieved by, and has standing to seek review of, the Board's order, which leaves in place a previous order declaring BNSF's rates unreasonably high and ordering hundreds of millions of dollars in estimated rate relief. *See generally WFA I*, 604 F.3d 602 (D.C. Cir. 2010).

## ARGUMENT

## I.    STANDARD OF REVIEW

This Court reviews the Board's decisions to determine whether they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and will uphold them only if the Board has "'cogently explain[ed] why it has exercised its discretion in a given manner and that explanation [is] 'sufficient to enable us to conclude that the [Board's action] was the product of reasoned decisionmaking.'" *U.S. Telecom Ass'n v. FCC*, 227 F.3d 450, 460 (D.C. Cir. 2000) (citation omitted).[5]

---

[5]  Because the order under review does not involve an actual petition to reopen, this case does not implicate the narrow limitation on reviewability set forth in *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987). *See id.* at 280 (holding that the agency's denial of a petition to reopen based on alleged "material error" is not subject to judicial review); *Town of Springfield v. STB*, 412 F.3d 187, 189 (D.C. Cir. 2005) (same).

## II.  THE BOARD'S ADHERENCE TO MODIFIED ATC WAS ARBITRARY AND CAPRICIOUS

### A.  Modified ATC Fails The Board's Own Analytical Framework And Rationale For Revenue Allocation Methodologies

In explaining why it departed from original ATC, the Board reasoned that any cross-over traffic revenue allocation methodology must accommodate two principles: (1) it "should take into account the important role that economies of density play in any cost-based revenue allocation approach"; and (2) "it should not create the implausible result of driving the revenue allocation below variable costs." *2012 Decision* at 10 (JA-__).  Because original ATC failed to accommodate the second principle on a small number of cross-over movements, the Board concluded that it must be discarded and replaced with Modified ATC. *Id.*

For reasons BNSF has repeatedly explained, however, Modified ATC *also* fails the Board's own standard.  Modified ATC violates the Board's primary "objective" that any revenue allocation methodology must "reflect[], to the extent practicable, the carrier's relative average costs of providing service over the" on-SARR and off-SARR segments, in order to better "approximate the outcome of a full SAC analysis, which provides origin-to-destination service for the entire traffic group." *Major Issues Rulemaking* at 24-25 (ADD-30-31).  Modified ATC, like MSP before it, fails to meet this "objective" because it is centered on allocating

38

revenues based on variable costs, rather than average total costs. *See id.* at 25 (ADD-31). Because Modified ATC places too much emphasis on variable costs, it significantly dilutes the impact of economies of density—thereby undermining the Board's first principle as applied to *all cross-over movements*.

Moreover, for the vast majority of cross-over traffic, original ATC does *not* drive revenue allocation for the on-SARR portion of a cross-over movement below variable costs. With respect to that traffic, the application of Modified ATC is completely unnecessary to further the Board's second principle (or for any other reason). Accordingly, Modified ATC does major violence to the first principle, with only marginal improvement on the second (as compared to original ATC), and unjustifiably introduces into the SAC analysis significant bias in favor of complaining shippers.

## B. The Board's Rationales For Adhering To Modified ATC In This Case Are Arbitrary And Capricious

The Board *agrees* with BNSF that Modified ATC has flaws and *agrees* with BNSF that another approach would strike a better balance of the two competing interests the Board has identified. Indeed, the Board has initiated a rulemaking that seeks to supplant Modified ATC with a methodology that is nearly identical to the alternative approach that BNSF described in this very case. *See Rate Reforms NPRM* at 17-18 (ADD-101-02). Echoing BNSF, the Board explained that the Alternative ATC approach is superior to Modified ATC because it "avoids driving

39

the revenue allocation below variable costs while giving more weight to the important role that economies of density should play in any cost-based revenue allocation approach." *Id.* at 18 (ADD-102). The Board nonetheless adhered to Modified ATC in this case.

Unable to defend substantively its continuing application of Modified ATC in this case (given its acknowledgement that a superior alternative is available), the Board resorted to a pair of strained procedural ploys. First, the Board concluded that BNSF's disproportionality critique of Modified ATC fell outside the scope of this Court's remand. The Board nonetheless exercised its "discretion to broaden the issues on remand," but it "look[ed] to the statutory reopening standard" to "guide [its] decision-making." *2012 Decision* at 11 (JA-__). Second, the Board concluded that BNSF could not show the "material error" required under that heightened standard, because its arguments were "not advanced prior to [the Board's] decision on the merits." *Id.* at 11-12 (JA-__-__).

The Board's resort to the "material error" standard was error. BNSF's argument that Modified ATC is a vastly disproportionate (and thus unnecessarily distortive) response to a problem that manifests, if at all, for a small amount of cross-over traffic has been part-and-parcel of BNSF's "double counting" objection against the use of Modified ATC in this case all along, including before this Court. And nothing in this Court's opinion in *WFA I* suggests that this argument was

40

considered and rejected or otherwise outside the scope of the remand.  In any event, the Board's claim that BNSF did "not advance[]" these arguments before the *2012 Decision* is plainly erroneous.  Because the Board offers no other justification for its adherence to an admittedly inferior methodology in this case, its decision must be vacated.

>    **1.    BNSF's arguments against application of Modified ATC in this case are squarely within the scope of this Court's remand.**

In *WFA I*, this Court remanded the case to the Board so that it could "address BNSF's double-counting objection to modified ATC."  *WFA I*, 604 F.3d at 613.  This Court summarized BNSF's arguments, explaining that BNSF objected to Modified ATC because it places too much weight on variable costs (*i.e.*, "variable costs are counted twice") and therefore "fails appropriately to consider economies of density."  *Id.* at 612.  Having found that a remand was required, this Court did not address, much less reject, any of the subsidiary points BNSF raised about the ill effects of applying Modified ATC, including that it is a disproportionate response to a relatively minor problem.

On remand, BNSF reiterated its prior arguments against Modified ATC, explaining once again that: (1) Modified ATC badly skews allocation of revenues in favor of the SARR; (2) the Board's rationale for departing from original ATC and tolerating the bias introduced by Modified ATC makes no sense; (3) even

41

*accepting* the Board's rationale, Modified ATC is a disproportionate response to a relatively minor perceived problem with low-rated cross-over traffic; and (4) therefore, an alternative approach that focuses on the perceived problem with low-rated traffic on the on-SARR portion of a cross-over movement would be far superior. The Board read this Court's decision as arbitrarily limiting the scope of the remand to the first two, and excluding the latter two, because this Court did not specifically "direct" the Board to address these particular arguments against the application of Modified ATC. *See 2012 Decision* at 11 (JA-__). The Board's crabbed reading of this Court's instructions on remand cannot withstand scrutiny.

BNSF's argument that Modified ATC represented a disproportionate response to the perceived defect of original ATC is—and always has been—part-and-parcel of BNSF's "double counting" objection. Indeed, the very reason BNSF has contended that Modified ATC is a "disproportionate remedy" is because it *unnecessarily* gives too much emphasis to allocating revenues based on variable costs at the expense of economies of density. Put another way, BNSF has consistently asserted that the most inexplicable aspect of Modified ATC is that it dilutes the impact of economies of density by "double counting" variable costs on high-rated cross-over traffic even though there is *no risk* that revenues for this traffic would be driven below its variable costs if revenue were allocated in a way—by average total costs—that more fully accounts for economies of density

(as was done under original ATC). Indeed, as a technical matter, "double counting" happens under Modified ATC only with respect to cross-over traffic for which revenues exceed variable costs—first when revenues are initially allocated to cover the variable costs for the on-SARR portion of movements and again when remaining revenues are allocated in proportion to average total costs. (In contrast, variable costs are counted only once for on-SARR portions of cross-over movements that do not cover their variable costs, because in those circumstances there are no revenues left to allocate based on average total costs.)

The Board's too-narrow interpretation of this Court's remand is also belied by the Board's own emphasis on the need to "balanc[e]" the two competing interests it has identified. *2012 Decision* at 10 (JA-__). Such balancing inherently concedes the need to determine the extent to which the methodology at issue advances—or undermines—each of those interests. The Board could not rationally conclude that Modified ATC strikes an "appropriate balanc[e]," *id.*, while at the same time refuse to consider the degree to which Modified ATC unnecessarily dilutes economies of density by double counting variable costs on high-rated traffic.

In sum, the Board's attempt artificially to excise BNSF's disproportionate remedy critique from the scope of this Court's remand is unreasoned and unreasonable.

43

**2.    BNSF timely raised and consistently pressed its argument that wholesale application of Modified ATC was a wildly disproportionate solution to the problem perceived by the Board and that a superior alternative was available.**

The Board's finding that BNSF had not previously advanced its disproportionate-remedy argument is foreclosed by the administrative record. From the outset, BNSF has consistently argued that Modified ATC represents a disproportionate remedy that was not properly tailored to the relatively minor problem associated with applying original ATC to low-rated cross-over traffic. As detailed below, BNSF raised this point at the first possible opportunity and at every opportunity since—in its Petition for Reconsideration of the *2007 Decision*, in response to WFA's revised SAC presentation, before this Court in *WFA I*, and again to the Board on remand. Indeed, the Board acknowledges as much in the decision under review.

In its Petition for Reconsideration of the *2007 Decision*, BNSF argued that, "even if the Board's concern about the effect of ATC on low rated traffic justified suspension of the average total cost approach *on that traffic*, there is no conceivable justification for applying the modified ATC methodology *to all cross-over traffic*." BNSF PFR at 3 (emphasis added) (JA-__). This is because, BNSF explained, for cross-over movements with revenues "well in excess of variable costs," "there is no risk that ATC will allocate to the SARR less than [its projected] variable costs." *Id.* at 19 (JA-__). Instead, the only effect of applying Modified

44

ATC to such traffic is "to dilute the impact of density on relative on-SARR and off-SARR costs," thereby distorting the SAC analysis for no reason. *Id.* at 3 (JA-__). As if that were not enough, BNSF also demonstrated this point graphically, using a chart that showed how Modified ATC, when applied to cross-over traffic that covers its variable costs, unnecessarily skews the result in favor of the complainant shipper. *See id.* at 15-16 (JA-__-__).

The Board acknowledged the substance and timing of this precise argument in the *2012 Decision*. As the Board put it when summarizing BNSF's Petition for Reconsideration: "Finally, BNSF stated that, even if the Board were rightly concerned with ensuring a revenue allocation under which the SARR would cover the incumbent's variable costs on each movement, the Board had no valid reason to apply modified ATC to those cross-over movements that, in fact, covered those costs under the original ATC methodology." *2012 Decision* at 4 (JA-__).

BNSF continued to press its disproportionate-remedy challenge in its reply to WFA's revised SAC presentation. BNSF explained that—accepting *arguendo* the Board's rationale—there was no longer any need to apply Modified ATC in this case because WFA had omitted almost all of the low-rated cross-over traffic that gave rise to the Board's concern in the first place. As BNSF put it at the time, if the Board continued to apply Modified ATC despite the elimination of such

traffic, it "would be correcting a problem that no longer exists and providing a revenue windfall to the SARR." *BNSF 3SR* at I-22 (JA-___).

BNSF pressed this argument again on appeal to this Court. As it had before the Board, BNSF argued that there was no reason to apply a biased methodology that dilutes the impact of economies of density on high-rated cross-over traffic when, under original ATC, there is no risk of R/VC ratios for such traffic falling below 100%. *WFA I* Opening Brief at 57-58. In particular, BNSF explained that the Board had failed to provide any reasoned "explanation for persisting to apply the Modified ATC approach after WFA had overhauled its case to eliminate [nearly] all low-rated traffic." *Id.* at 25. In other words, the Board's continued application of Modified ATC to *all* cross-over traffic—even high-rated traffic— marked a substantial overreaction to the problem that allegedly required abandoning original ATC and adopting Modified ATC. BNSF also provided this Court with the aforementioned chart, graphically demonstrating how "Modified ATC produces flawed results even in circumstances where revenues from cross-over traffic exceed variable costs." *Id.* at 53.

In short, the Board's finding that BNSF did not raise a "disproportionate-remedy argument" until remand cannot be reconciled with the record—or, for that matter, the Board's own description of the record.

The Board also was wrong to find that BNSF had not previously advanced a superior alternative methodology.  Although the Board conceded that BNSF had "alluded to [its] alternative" ATC methodology in its Petition for Reconsideration, *see 2012 Decision* at 12 (citing BNSF PFR at 19) (JA-__), it held that BNSF did not "present that alternative in adequate detail," *id.*  As an initial matter, and as Commissioner Begeman pointed out, it was "not appropriate" for the Board "to put the burden on [BNSF] to remedy a problem [that BNSF had identified] with the Board's rate processes" because "it is the agency's ultimate responsibility and duty to develop a superior alternative."  *Id.* at 13 (Begeman, dissenting) (JA-__).

In any event, to the extent BNSF was required to identify a superior alternative, it merely had to describe a different approach with "sufficient detail" to "permit evaluation and warrant attention" by the Board.  *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169-70 (D.C. Cir. 1987).  In other words, at most, BNSF simply had to put the agency on notice that a reasonable alternative was available; the Board would then be required to provide a reasoned explanation for its continued adherence to Modified ATC in light of that alternative.  *See id.* at 1169 ("'[T]he failure of an agency to consider obvious alternatives has led uniformly to reversal.'" (citation omitted));  *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984) ("It is well established that an agency has a duty to consider responsible alternatives to its chosen policy and to give a

reasoned explanation for its rejection of such alternatives." (footnote omitted)). Contrary to the Board's assertion, BNSF more than satisfied its responsibility to put the Board on notice of a reasonable available alternative.

As the Board acknowledged on remand, BNSF "suggested in its petition for reconsideration that the Board not apply modified ATC to 'high-rated traffic.'" *See 2012 Decision* at 12 n.19 (quoting BNSF PFR at 19) (JA-__).  The Board claimed that this was merely a "passing comment" that was "insufficient to alert the Board to BNSF's alternate ATC methodology." *Id.*  Neither characterization is accurate.  To begin, BNSF's contention was much more than a mere "passing comment":  it was a distinct and fully developed contention that, at a minimum, the Board should not modify original ATC when the revenues allocated by that method to the on-SARR portion of cross-over traffic cover the SARR's variable costs.  *See* BNSF PFR at 3, 19 (JA-__, __).  That position, moreover, was articulated in ample detail to warrant the Board's attention.  Indeed, the Board's own articulation of the Alternative ATC proposal mirrored BNSF's suggestion— namely, that original ATC should apply to high-rated traffic while some modified form of ATC should apply to low-rated traffic.  *See Rate Reforms NPRM* at 17-18 (ADD-101-02).

The Board's reasoning on remand suffers from another fundamental defect. The Board concedes that BNSF "alluded to [its] alternative" ATC proposal in its

Petition for Reconsideration when it argued that Modified ATC should not apply to "high-rated traffic." *2012 Decision* at 12 & n.19 (JA-__).  That, of course, is precisely the argument BNSF has made all along when explaining that Modified ATC is a disproportionate remedy—*i.e.*, there is no legitimate reason to alter original ATC when applied to cross-over traffic with revenues that exceed its variable costs.  It is semantic nonsense for the Board to characterize as distinct "issues" BNSF's "disproportionate response" argument and its proposal of a *more proportionate* response.    BNSF's alternative ATC proposal was simply a manifestation of its longstanding critique that Modified ATC unjustifiably dilutes the impact of economies of density on cross-over traffic with revenues that cover its variable costs.  The entire purpose of the alternative methodology is to ameliorate Modified ATC's overreaching, by departing from the original ATC approach only where necessary to correct the perceived problem—*i.e.*, where applying original ATC would drive revenue for the on-SARR portion of a cross-over movement below its variable costs.

Finally, it is instructive that not even WFA argued that BNSF had forfeited these arguments.  Rather, WFA simply contended that it would be "unfair" to apply a methodology other than Modified ATC in this case.  *See* Complainants' Reply to Comments of BNSF Railway Co. on Remand at 38 & n.18, STB No. 42088 (Mar. 18. 2011) ("*WFA Reply on Remand*") (JA-__).  WFA's failure even to

49

raise the prospect of forfeiture indicates the Board was merely searching for an expedient justification that would allow it to defend the application of Modified ATC in this case while at the same time announcing its intent shortly to discard it based on the very weaknesses BNSF had identified.

Because BNSF advanced its disproportionate-remedy argument from the beginning, and throughout this case, the Board's order must be vacated.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency's decision is arbitrary and capricious when it "offer[s] an explanation for its decision that runs counter to the evidence before" it).

### C.    At A Minimum, The Board's Refusal To Hold This Case In Abeyance Pending The *Rate Reforms* Rulemaking Was Arbitrary And Capricious

Having determined to stick with Modified ATC in this case, the Board announced in its next breath its plan "to begin a rulemaking proceeding to consider whether a methodology similar to BNSF's alternative ATC [proposal] might be" an approach that "better accommodate[s] the two competing principles" identified by the Board.  *2012 Decision* at 12 (JA-___).   The Board observed that it "considered placing this case in abeyance (again) while that rulemaking runs its course, but decided against doing so."  *Id.*   Other than its meritless forfeiture charge, the Board's only rationale for that decision was its exasperation with the duration of this case.   But an agency may not apply an admittedly inferior

50

methodology—that could impact the ultimate relief awarded by tens or even hundreds of millions of dollars—simply because it is tired of adjudicating a case. This is especially true here because it is the Board—not BNSF—that bears responsibility for the protracted delays in this matter.

Moreover, the Board previously held this case in abeyance in materially indistinguishable circumstances, a course that it characterized as necessary "to ensure" the application of "an unbiased and accurate" approach.  *Major Issues Rulemaking* at 76 (ADD-82).  The Board does not acknowledge its change of heart as to the circumstances in which a hold is appropriate, much less attempt to distinguish the circumstances in which it previously held this case in abeyance. The Board now champions a methodology that is based on (and nearly identical to) BNSF's proposal in this very case, but BNSF is precluded from benefiting from it, for no better reason than the Board's arbitrary decision that "now" is the time that this case "must come to an end."  That is paradigmatically arbitrary and capricious and obviously unfair, as the dissent recognized.  *See 2012 Decision* at 13-14 (Begeman, dissenting) (JA-__-__).

## 1.    The Board improperly failed to acknowledge its about-face.

When an agency departs from its prior practice or precedent, the agency must at least "display awareness that it *is* changing position."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see Ramaprakash v. FAA*, 346

F.3d 1121, 1125 (D.C. Cir. 2003) (Roberts, J.) ("An agency's failure to come to grips with conflicting precedent constitutes 'an inexcusable departure from the essential requirement of reasoned decision making.'" (citation omitted)).  Here, the Board failed to acknowledge that it had changed position about when it is appropriate to hold this case in abeyance pending a rulemaking.  Such a critical omission demonstrates a lack of reasoned decisionmaking by the Board, and itself requires vacatur.

The Board's decision on remand is directly contrary to its own prior conclusions in this very case about the circumstances in which a hold is appropriate.  The Board previously held this matter in abeyance because it "implicated" issues that were going to be examined in the *Major Issues* rulemaking.  *Major Issues NPRM* at 2 (JA-__).  The Board reasoned that it was appropriate to hold the case in order "to ensure" that the methodology ultimately applied "would establish an unbiased and accurate result."  *Major Issues Rulemaking* at 76 (ADD-82).  If the Board had refused to hold this case in abeyance, it would have applied the now-discredited MSP approach for allocating revenues from cross-over traffic.  Such a course, the Board later confirmed, would have been gravely mistaken.  The Board concluded—in no uncertain terms—that it is not "appropriate to apply flawed or discredited procedures," *2007 Decision* at 20

(JA-__), especially when doing so "would perpetuate a flawed approach long into the future," *Major Issues Rulemaking* at 76 (ADD-82).

The Board has taken the exact opposite position here, without so much as acknowledging the change or explaining why it is suddenly more comfortable applying a defective methodology with hundreds of millions of dollars at stake. The only apparent difference is the passage of time: when the Board held this case for *Major Issues*, it was approaching the three-year mark, and it is now "approaching the eight-year mark." *2012 Decision* at 12 (JA-__). That, however, would be a patently arbitrary basis for decision: the dangers of applying a discredited methodology are no less pernicious now than they were then. Moreover, it is especially unfair for the Board to refuse to hold this case pending a rulemaking that seeks to remedy the defects of a methodology the Board *sua sponte* adopted in this very case. *See id.* at 13 (Begeman, dissenting) ("I do not see why if it was appropriate to hold the case in abeyance when the Board was creating original ATC in *Major Issues*, that it is not also appropriate to do so now for a proceeding to address the very problems posed as a result of ATC and modified ATC.") (JA-__).

The Board's failure to hold this case in abeyance pending *Rate Reforms* also marks an unacknowledged departure from its promise in the *2009 Decision*. Explaining how it would handle arguments respecting *Major Issues* going forward,

the Board stated that "[i]f a change is warranted, we will either address the matter within the context of that adjudication or, if the advocated change is substantial, we will hold the case in abeyance and seek broader public input." *2009 Decision* at 5 (JA-__).   The Board plainly believes a "change is warranted"—and clearly considers the Alternative ATC approach a "substantial" change, given that it has initiated a rulemaking to implement the change.  The Board's decision not to hold this case in abeyance directly contravenes the ground rules it set for itself in the *2009 Decision*.

The Board at no point acknowledges its volte-face on this issue.   The Board's failure to recognize—let alone explain—its "inconsistent treatment … supplies an independent basis for vacating the Board's order in this case." *Moshea v. NTSB*, 570 F.3d 349, 352-53 (D.C. Cir. 2009).

### 2. The Board's rationales for refusing to hold this case in abeyance cannot withstand scrutiny.

In any event, none of the Board's justifications for refusing to hold this case has merit.

**a.** The Board first explained that, "having concluded that [BNSF's] alternative ATC approach was raised too late," it would "not hold this case in abeyance to await the outcome of the rulemaking because that would encourage future litigants to also try out new theories at late stages in the process." *2012 Decision* at 12 (JA-__).  As demonstrated above, however, BNSF was not tardy.

Quite to the contrary, since its 2007 Petition for Reconsideration, BNSF has consistently urged the Board to either revert to original ATC *or* adopt a more tailored alteration to original ATC to address the limited problem associated with low-rated cross-over traffic. *See supra* at 21-29. It is *the Board*, not BNSF, that belatedly realized that Modified ATC unnecessarily dilutes the impact of economies of density and that a more modest refinement of original ATC was both available and appropriate. The Board's "gaming" concern, therefore, has no basis in the record.

**b.** The Board's second reason for refusing to hold this case in abeyance is even less rational: "[W]e have not yet finalized our proposal, made it public or received comments on it; thus, we cannot be sure of the precise nature of our planned rule." *2012 Decision* at 12 (JA-__). To the extent the Board was suggesting that it did not yet know what its *proposed* rule would look like, that is directly contradicted by its own opinion and by Commissioner Begeman's dissent. *See id.* (JA-__) (explaining that the rulemaking would "consider whether a methodology similar to BNSF's alternative ATC" approach should be adopted); *id.* at 14 (JA-__) (Begeman, dissenting) (forthcoming rule was "based on BNSF's proposal").

To the extent the Board was merely observing that its *proposed* rule may not in fact become its *final* rule, that unremarkable truism also does not justify the

Board's decision.  Indeed, the very reason the Board held this case in abeyance pending *Major Issues* was to follow the prudent course of waiting to see how the rulemaking played out.  That sort of uncertainty—"what will the final rule be?"—may be a reason not to *immediately* impose the proposed rule in a pending case; but it is not a legitimate reason to refuse to hold a pending case in abeyance.  Indeed, under the Board's logic, no case should be held in abeyance pending a rulemaking, because there is always the possibility that the final rule will differ from the proposed rule.

    **c.**  The Board's final reason for not holding this case in abeyance appears to reveal its actual motivation.  The Board observed that, if it applied BNSF's alternative ATC methodology to this case, WFA may be "entitled to revise its SARR once *again*," which "could lead to still more litigation."  *2012 Decision* at 13 (JA-__).  Rather than face the prospect of continued litigation, the Board declared that "[l]itigation must come to an end at some point," and "that point has been reached here."  *Id.* at 12-13 (JA-__).  To be clear, BNSF does not agree with the Board's view that applying a revenue allocation methodology like Alternative ATC would entitle WFA to redesign its SAC presentation yet again.  But even if it did, this rationale cannot sustain the Board's refusal to hold this case in abeyance, for at least three reasons.

*First*, mere exasperation with how long a case has gone on is not a legitimate reason for knowingly applying a profoundly flawed methodology, rather than holding an affected case in abeyance.   An agency's obligation to provide a "reasoned explanation" for its decision becomes "especially important when the agency admits its own choice is substantially flawed."   *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984).   And, in contrast to other situations where this Court has found reasoned decisionmaking despite application of an admittedly flawed approach, the Board does not and could not assert that it must continue to apply this flawed methodology because it lacks a better alternative.   *E.g., Xcel*, 453 F.3d at 484 (approving the Board's adherence to MSP, despite its flaws, because the Board had not "yet" been "presented with a [superior] model").   Indeed, the Board concedes that a superior methodology—in the form of Alternative ATC—is readily available.   *See id.* (warning that if the Board were "presented with a model that took account both of the economies of density and of the diminishing returns thereto, a decision to adhere to its MSP model would be on shaky ground indeed").

The Board's decision to adhere to Modified ATC despite the availability of a fairer and substantively superior alternative is grounded ultimately in nothing more than its naked desire that this case be over and done with.   But the invocation of such arbitrary time limits—untethered from any legal rule or regulation—is a

57

paradigmatic example of capricious decisionmaking.  Despite the Board's fervent desire, this case cannot simply be swept under the proverbial rug.  *City of Brookings Mun. Tel. Co.*, 822 F.2d at 1169 ("This court has been particularly reluctant to blink at an agency's ignoring ostensibly reasonable alternatives where it admits . . . that the choice embraced suffers from noteworthy flaws.").

*Second*, the Board's sudden thirst for finality is a particularly inapt justification for the Board's disparate treatment of BNSF here—where the responsibility for the delays in this matter rests squarely with the Board, and not with BNSF.  Indeed, the Board does not even suggest that BNSF is somehow responsible for this case's protracted history.  As noted, it was the Board that held this case in abeyance for eight months pending the *Major Issues* rulemaking.  And that was just the beginning.  In its *2007 Decision*, the Board took the extraordinary step of permitting WFA to redesign its SAC presentation.  And because of that, it was not until February 2009 that the Board issued its final decision finding BNSF's rates to be unreasonable.  The resolution of the case was further delayed by BNSF's first appeal and the necessity for further proceedings on remand.  After this Court issued its decision in May 2010, moreover, this case did not advance until BNSF filed an unsolicited brief with the Board six months later, setting forth its arguments for how the Board should proceed.  *See BNSF Comments on Remand* at 1 (JA-__).  WFA filed its response in March 2011.  And the Board did not act

thereafter for another *15 months*.  It was not until June 15, 2012—more than two years after this Court's decision remanding the case and more than 18 months after BNSF filed its brief—that the Board issued the decision currently on review.

Because the Board—not BNSF—is responsible for this case's lengthy history, it was arbitrary and capricious for the Board to conclude that BNSF must suffer the application of a flawed methodology merely because this case was "approaching the eight-year mark." *2012 Decision* at 12 (JA-__); *see id.* at 13 (Begeman, dissenting) ("I also do not believe that because the parties in this case have endured such a lengthy process, in part due to the actions by the Board, that we can justify taking a pass here.") (JA-__).

*Third*, the Board's single-minded focus on finality is flatly contrary to the emphasis it had previously placed on "fairness."  After finding that BNSF's rates were both reasonable on their face and reasonable under the SAC test, the Board nonetheless allowed WFA to redesign its SAC presentation and submit what was effectively a brand new case.  *See 2007 Decision* at 3 (JA-__).  The Board acknowledged that such an extraordinary step was not legally required and indeed was contrary to the Board's general practice.  *See id.*  The Board concluded, however, that "*fairness* dictate[d] that WFA have an opportunity to modify its SAC presentation in light of the new revenue allocation methodology." *Id.* (emphasis added); *see id.* at 20 (same) (JA-__).  And then, even though WFA never identified

a flaw with original ATC, the Board adopted Modified ATC *sua sponte* after it perceived a problem that was detrimental to shippers like WFA.

The Board's commitment to such fairness apparently ended somewhere between 2007 and 2012. As Commissioner Begeman observed, there is nothing "fair" about maintaining a flawed "methodology for this case, while at the same time announcing plans to begin a rulemaking proceeding to develop a superior alternative (based on BNSF's proposal) that would only be applied to future cases." *2012 Decision* at 14 (Begeman, dissenting) (JA-__). If "fairness" dictated anything in this case, it is that BNSF should not be subject to the largest forced wealth transfer in the Board's history—totaling hundreds of millions of dollars—based on a methodology that the Board acknowledges is inferior but nonetheless applies because, well, "[l]itigation must come to an end at some point." *2012 Decision* at 13 (JA-__).

60

## CONCLUSION

For the foregoing reasons, the Board's decision should be vacated.

Respectfully submitted,

December 5, 2012                          /s/ Richard P. Bress

    Richard E. Weicher                  Richard P. Bress
    Jill K. Mulligan                    Michael J. Gergen
    BNSF RAILWAY COMPANY                Lori Alvino McGill
    2500 Lou Menk Drive                 Paul T. Crane
    Fort Worth, TX 76131                LATHAM & WATKINS LLP
                                        555 Eleventh Street, NW
    Samuel M. Sipe, Jr.                 Suite 1000
    Anthony J. LaRocca                  Washington, DC 20004
    STEPTOE & JOHNSON LLP               Tel:  (202) 637-2200
    1330 Connecticut Avenue, NW         Fax: (202) 637-2201
    Washington, DC  20036

## CERTIFICATE OF COMPLIANCE

In accordance with Circuit Rule 32(a) and Rule 32(a)(7) of the Federal Rules of Appellate Procedure, the undersigned certifies that the accompanying brief has been prepared using 14-point Times New Roman typeface, and is double-spaced (except for headings and footnotes).

The undersigned further certifies that the brief is proportionally spaced and contains 13,932 words exclusive of the certificate required by Circuit Rule 28(a)(1), table of contents, table of authorities, glossary, signature lines, and certificates of service and compliance. The undersigned used Microsoft Word to compute the count.

/s/ Richard P. Bress
Richard P. Bress

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December, 2012, I electronically filed the foregoing Brief of Petitioner (Corrected) with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the registered CM/ECF users listed below.

Erik Gerrard Light
Raymond Allen Atkins
Craig Mitchell Keats
Surface Transportation Board
(STB) Office of General Counsel
395 E Street, SW
Washington, DC  20423-0001

John H. LeSeur
Christopher A. Mills
Peter Anthony Pfohl
Slover & Loftus LLP
1224 Seventeenth Street, NW
Washington, DC  20036

Nickolai Gilford Levin
Robert B. Nicholson
United States Department of Justice
(DOJ) Antitrust Division, Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

I further certify that, pursuant to D.C. Circuit Rules 25 and 31, five (5) paper copies of the Brief of Petitioner (Corrected) will be hand-delivered to the Clerk of the Court.

DATED:  December 5, 2012

/s/ Richard P. Bress
Richard P. Bress